822 F.2d 1406
 56 USLW 2038, 40 Ed. Law Rep. 673
 Bruce STEIN and Martha Dahlinger, Plaintiffs-Appellants,
v.
PLAINWELL COMMUNITY SCHOOLS, David L. Jones, Superintendent,
Plainwell Community Schools, Portage Public
Schools, and George L. Conti,
Superintendent, Portage Public
Schools, Defendants-Appellees.
 No. 86-1489.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 17, 1987.
Decided July 6, 1987.
 
 Ross E. Chapman (Lead Counsel), Deming, Hughey, Lewis, Keiser, Allen & Chapman, P.C., Kalamazoo, Mich., Robert A. Sedler (argued), Detroit, Mich., for plaintiffs-appellants.
 Douglas W. Peterson (argued), Gemrich, Moser, Dombrowski, Bowser & Fette, Kalamazoo, Mich., Lawrence J. Murphy (argued), Howard & Howard, P.C., Kalamazoo, Mich., John G. Manske, Richard D. Fries, for defendants-appellees.
 Before MERRITT, WELLFORD and MILBURN, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 The basic question presented on appeal is: what kind of invocations and benedictions, if any, does the Establishment Clause of the First Amendment permit the public schools to conduct at their annual commencement exercises?
 
 
 2
 The facts are not in dispute and are found in the joint stipulation filed by the parties. The Plainwell Community Schools and the Portage Public Schools are public school districts organized under Michigan law and located in the western part of the state near the City of Kalamazoo. At both the Plainwell High School and Portage Central High School commencements, invocations and benedictions are regularly included in the annual commencement ceremonies. Both commencements are held at outdoor athletic facilities during the evening. Attendance at the commencement ceremonies by graduating seniors is voluntary, and receipt of a diploma is not conditioned upon attendance at the ceremony.
 
 
 3
 At the Plainwell commencement, the invocation and benediction are delivered by two students. These students are volunteers chosen from a group of honor students. The content of the invocation and benediction is determined by the students.[1]
 
 
 4
 At the Portage Central commencement, the content of the ceremony is organized and developed by the graduating seniors. For at least fifteen years they have elected to include an invocation and benediction in the commencement ceremony. The invocation and benediction have been given by local ministers and clergy of various Christian denominations chosen by the senior class representatives.[2]
 
 
 5
 In its opinion of May 22, 1985, denying plaintiffs' motion for a preliminary injunction, the District Court applied the three-prong test of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to the invocations and benedictions that were at issue in this case. Stein v. Plainwell Community Schools, 610 F.Supp. 43 (W.D.Mich.1985). The District Court concluded that the inclusion of an invocation and benediction in a high school ceremony advanced a secular purpose, did not have the primary effect of advancing religion, and did not foster excessive governmental entanglement with religion. 610 F.Supp. at 50. The Court found that the inclusion of prayer in a commencement ceremony had a purpose that was "partly religious and partly ceremonial," 610 F.Supp. at 47, and that in the context of the present case, there was no claim that the school district was using the prayers to "proselytize the audience to accept the tenets of any particular faith." 610 F.Supp. at 48. The District Court adopted the reasoning of this opinion on the injunction when it dismissed plaintiffs' claims on the merits.
 
 
 6
 The school boards argue that the limitations on school prayer developed for the classroom under the line of cases beginning with Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (officially sponsored school prayer invalid), simply do not apply because graduation exercises are only annual occasions of a festive, celebratory nature. They reinforce their argument by pointing out that attendance and participation by the students are not required and that the setting--an auditorium or a football field with parents and friends in attendance--is different from the classroom.
 
 
 7
 The plaintiffs, citing this same line of Supreme Court school prayer decisions[3] as well as a lower court decision prohibiting prayer at commencement exercises,[4] argue to the contrary that all invocations and benedictions in the school context that invoke the image of a God or Supreme Being, including all sectarian, Christian, Jewish or other invocations of the deity, violate the First Amendment. They reinforce their argument by pointing out that graduation ceremonies are exercises, like regular school classes, directed at public school children. They contend that the same First Amendment values of liberty of conscience, state neutrality and noninterference with religion that prohibit school prayer should also prohibit such invocations and benedictions at commencement exercises.
 
 
 8
 From the beginning of the colonial period to the present, American churches have taken their various religious differences seriously, and under the Free Exercise and Establishment clauses taken together, we have generally accepted and settled on an accommodation: The concept of the equal liberty of conscience is our guiding principle. In our national and community life, we can never be sure whether our particular religious, sectarian and moral convictions will be in the majority or the minority. So as a diverse people we have rejected the notion of a confessional state that supports religion in favor of a neutral state designed to foster the most extensive liberty of conscience compatible with a similar or equal liberty for others. To those who act or argue against this principle of equal liberty of conscience on grounds that their duty is to use the state in support of their particular beliefs, we answer that we cannot expect others to accept an inferior liberty. To those who say that the principle of equal liberty of conscience has the effect of rejecting the absolute nature of their religious beliefs, we reply that if any principle can be agreed to, it can only be that of an equal liberty of conscience for all.
 
 
 9
 Liberty of conscience is limited by the common interest in public order and security. The Supreme Court recently concluded in Marsh v. Chambers, 463 U.S. 783, 786, 103 S.Ct. 3330, 3333, 77 L.Ed.2d 1019 (1983), over the dissent of three members, that individuals may be required to make some accommodation with "the history and tradition of this country." It is at this boundary between liberty of conscience and public order and tradition that we find ourselves in this case. Admittedly, it is a somewhat inexact boundary that we must survey, and there is room for differences of opinion on the question. Under traditional doctrines of separation of powers and federalism, it is the role of the federal courts, and in the end the Supreme Court, to draw the line.
 
 
 10
 In Marsh v. Chambers, the Supreme Court, looking primarily to the intent of the framers of the Constitution and historical practice since 1789, id. at 786-792, 103 S.Ct. at 3333-36, upheld "nonsectarian," id. at 793 n. 14, 103 S.Ct. at 3337 n. 14 "nonproselytizing" legislative invocations that do not "symbolically place the government's official seal of approval on one religious view," id. at 792, 103 S.Ct. at 3336 (citation omitted). The Court emphasized that "civil" or secularized invocations are used across the country to open legislative, judicial, and administrative sessions of state legislatures, city councils, courts and other public bodies, as well as by private institutions of all kinds. So long as the invocation or benediction on these public occasions does not go beyond "the American civil religion,"[5] so long as it preserves the substance of the principle of equal liberty of conscience, no violation of the Establishment Clause occurs under the reasoning of Marsh. Id. at 793, n. 14, 103 S.Ct. at 3337 n. 14.
 
 
 11
 The annual graduation exercises here are analogous to the legislative and judicial sessions referred to in Marsh and should be governed by the same principles. The invocation and benediction at a graduation ceremony serves the "solemnizing" function described by Justice O'Connor in her concurrence in Lynch v. Donnelly :
 
 
 12
 [S]uch governmental "acknowledgments" of religion as legislative prayers of the type approved in Marsh v. Chambers, government declaration of Thanksgiving as a public holiday, printing of "In God We Trust" on coins, and opening court sessions with "God save the United States and this honorable court" ... serve
 
 
 13
 * * *
 
 
 14
 the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society.
 
 
 15
 465 U.S. 668, 692-93, 104 S.Ct. 1355, 1369, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) (citation omitted).
 
 
 16
 Like federal, state and local legislative and court sessions throughout the country, there are thousands of public graduation exercises annually. They are frequently memorable occasions for students, parents and friends. To prohibit entirely the tradition of invocations at graduation exercises while sanctioning the tradition of invocations for judges, legislators and public officials does not appear to be a consistent application of the principle of equal liberty of conscience.
 
 
 17
 Furthermore, unlike classroom prayer, ceremonial invocations and benedictions present less opportunity for religious indoctrination or peer pressure. The potential for coercion in the prayer opportunity was one of the distinctions employed by the Court in Marsh to separate legislative prayer from classroom prayer. 463 U.S. at 792, 103 Ct. at 3336 (citing Tilton v. Richardson, 403 U.S. 672, 686, 91 S.Ct. 2091, 2099, 29 L.Ed.2d 790 (1971), and Abington School Dist. v. Schempp, 374 U.S. 203, 290, 83 S.Ct. 1560, 1607, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)). Although children are obviously attending the ceremony, the public nature of the proceeding and the usual presence of parents act as a buffer against religious coercion. In addition, the graduation context does not implicate the special nature of the teacher-student relationship--a relationship that focuses on the transmission of knowledge and values by an authority figure. Therefore, the prayer in question here should be analyzed under the Marsh standards for ceremonial prayer notwithstanding the fact that a school function is involved.
 
 
 18
 At the same time, the invocations and benedictions delivered at these occasions should not be framed in language that is unacceptable under Marsh, language that says to some parents and students: we do not recognize your religious beliefs, our beliefs are superior to yours. The invocations and benedictions delivered here do not pass the Marsh test. They are framed and phrased so that they "symbolically place the government's seal of approval on one religious view"--the Christian view. They employ the language of Christian theology and prayer. Some expressly invoke the name of Jesus as the Savior. They are not the "civil" invocations or benedictions used in public legislative and judicial sessions as described in Marsh.
 
 
 19
 Accordingly, the judgment of the District Court is reversed and the case is remanded to the District Court for further proceedings and the granting of equitable relief under the test for neutrality established in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).
 
 
 20
 MILBURN, Circuit Judge, concurring.
 
 
 21
 I concur in Judge Merritt's opinion. However, I would point out that we can take judicial notice that invocations and benedictions at public school commencements have been a traditional practice since the beginning of the public schools in this country. Further, I would stress that in order for these ceremonial prayers to meet constitutional muster, the prayers offered must be nonsectarian and nondenominational. Moreover, the prayers offered must be similarly secular to those invocations and benedictions given at public governmental-sponsored occasions as in state legislatures, in the courts, and in Congress as approved by Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).
 
 
 22
 In my view, ceremonial school commencement prayers must not only meet these criteria, but must also meet the test in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); i.e., they advance a secular rather than a religious purpose of formally opening and closing the commencement ceremony and festivities; they do not have the primary effect of advancing religion; and they do not foster excessive entanglement of religion. However, most, if not all, of the challenged prayers, and especially that which is set out in footnote 2 of Judge Merritt's opinion, do not meet the criteria of the Lemon test.
 
 
 23
 If a prayer is nonsectarian and nondenominational, it does not cross that boundary of putting the state's imprint on religion. Only if a prayer violates those principles set out above does it cross that boundary. Further, in my view, our decision in this case should be limited to ceremonial public school commencement exercises.
 
 
 24
 WELLFORD, Circuit Judge, dissenting.
 
 
 25
 I agree with much of Judge Merritt's opinion and of Judge Milburn's concurring opinion. I find, however, that I must dissent from their conclusion. I first set out pertinent facts.
 
 
 26
 Dahlinger filed suit as a parent of a soon to be graduating senior in the class of 1985 at Portage High School, and he planned to attend the commencement ceremony. Stein filed suit as a parent of two students attending Plainwell High School, one of whom was planning to graduate, and Stein also planned to attend the forthcoming 1985 commencement service. Both plaintiffs alleged that school authorities established a policy at this annual commencement program to permit "the saying of prayers in the form of an invocation and benediction." The complaint averred that students said the prayers at the respective 1984 commencements, and that the purpose was to "invoke the guidance, assistance or blessing of the Deity," and that this practice constituted an unconstitutional "establishment of religion." The 1984 Plainwell program indicated that the class treasurer was to give an "invocation" following a processional, and that another of the graduating honor students was to give a "benediction" prior to a recessional. The audience was requested to stand during the invocation and the benediction. The parties stipulated that this had been the usual practice at the Plainwell High School commencement since 1980. Portage High, like Plainwell, held commencement services outdoors in an athletic facility not used for classroom or teaching purposes. Attendance was not required, and diplomas were granted regardless of attendance. Portage High School authorities permit graduating seniors to develop the commencement program. For several years a minister was "selected by representatives of the graduating class" to lead in the invocation and benediction.[1] The stipulations mention nothing about the "proposed content of the prayers," nor do they specify anything about invocation or benediction content in past years. The complaint said nothing about the content of the invocation and benediction except that they were "prayers."
 
 
 27
 The case came first before the district court on plaintiffs' motion for a preliminary injunction, which extraordinary relief the district court denied after a hearing. Judge Gibson concluded that the challenged practices "do not violate the establishment clause." Both defendants denied that it was "official policy" to have prayers at commencement or to accomplish the purposes averred by plaintiffs.
 
 
 28
 The later stipulation in this case set out that "some people in attendance at the graduation ceremonies will find the prayers at Invocation and Benediction to have a religious effect while others will find the prayers to be merely a formal way of opening and closing the graduation and, therefore, are only ceremonial in effect." Plainwell students determined the content of the invocation and benediction, and school authorities did not review the content; the only assistance was "in improving delivery." The Plainwell 1985 invocation and benediction began with the words, "Heavenly Father." The invocation also quoted words attributed to a philosopher, Kahlil Gibran,[2] and concluded with words attributed to Saint Francis of Assisi. The benediction included a familiar passage from the Bible with several references to the "Lord."
 
 
 29
 Neither the school authorities nor graduating seniors at Portage High School participated in or had prior knowledge of the content of the invocation and benediction at the 1985 commencement service. The Reverend Allen concluded his invocation at the Portage commencement by saying "we ask Your blessing upon us now and always through Jesus Christ our Lord," and he used the word "Lord" in the benediction. Again, after a hearing, the district court held that neither "ceremony" in question violated the establishment clause of the Constitution.[3]
 
 
 30
 I find myself in disagreement with my fellow judges in defining the question in this case. The majority has framed the question as "what kind of invocations and benedictions, if any, does the Establishment Clause ... permit ...?" This question and the majority's analysis emphasize the content of the invocations and benedictions at issue. The complaint, however, makes no reference to the "prayers" as being sectarian or denominational, which the majority has deemed most important. Rather, the complaint objects to any reference to the "Deity" for "guidance, assistance or blessing," or to "promote respect for and belief in the existence of the Deity." Clearly, plaintiffs question any reference to a Deity, not to any particular sectarian view, be it Christian, Jewish, Mohammedan, or otherwise. The Supreme Court, moreover, has asserted:The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.
 
 
 31
 Marsh v. Chambers, 463 U.S. 783, 794-95, 103 S.Ct. 3330, 3337-38, 77 L.Ed.2d 1019 (1983). Focus on content, therefore, is not in my view appropriate. Accordingly, the question in this case is not what kind of invocation or benediction, if any, does the Constitution permit; rather it is whether any invocation or benediction at a public high school commencement in the form of a prayer, or reference to the Deity, the content of which prayer is not officially prescribed, is constitutionally permissible. I would affirm the district court's finding of no establishment clause violation under the circumstances of these two public high school commencement ceremonies.
 
 
 32
 In McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed.2d 649 (1948), the Supreme Court considered prayer in public schools and whether a challenged practice violated the first amendment's proscription against establishment of a religion. In McCollum school officials regularly permitted religious leaders to use public school classrooms from fourth grade through ninth grade during regular classroom times for instruction on a voluntary basis. The Court held this to be violative of the establishment clause.
 
 
 33
 Within a few years the Supreme Court considered another establishment clause challenge involving religious instruction or observance in connection with public school students. See Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). In Zorach public school authorities arranged "released time" programs to allow students on a voluntary basis to go to religious centers for religious studies or devotions during regular school hours. Justice Douglas wrote for the Court that this practice met constitutional muster, stating:
 
 
 34
 The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other-hostile, suspicious, and even unfriendly.... Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; "so help me God" in our courtroom oaths-these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: "God save the United States and this Honorable Court."
 
 
 35
 We would have to press the concept of separation of Church and State to these extremes to condemn the present law on constitutional grounds....
 
 
 36
 We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe....
 
 
 37
 343 U.S. at 312-14, 72 S.Ct. at 683-84.
 
 
 38
 Two distinctions between McCollum and Zorach are instructive for the purposes of this case. One distinguishing feature, observed later by Justice Brennan, is that the program in McCollum "placed the religious instructor in the public classroom in precisely the position of authority held by regular teachers ...," while the program in Zorach did not. See Abington School Dist. v. Schempp, 374 U.S. 203, 262, 83 S.Ct. 1560, 1592, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring). Another distinction, characterized by one commentator as "the essential difference" between the unconstitutional program in McCollum and the constitutional one in Zorach, was that the program in Zorach took place "away from the school premises." See Note, First Amendment and Distribution of Religious Literature in the Public Schools, 41 Va.L.Rev. 789, 799 (1955).
 
 
 39
 In Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), state law directed that a teacher was to lead an officially sanctioned prayer daily in the public schools. The Regents' official prayer and this practice were prohibited by the Court as violative of first amendment strictures. Noteworthy factors in the Engel decision were the classroom setting, young children, daily repetition, official sanction, and leading by the teacher. Also significant is the defendant officials' concession that the practice was a religious activity developed as part of their "Statement on Moral and Spiritual Training in the Schools." Id. at 423, 82 S.Ct. at 1263.
 
 
 40
 Although the Court struck down this daily imposed classroom activity, it is well to note what the Court said the Engel decision did not do:
 
 
 41
 There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored in this instance.
 
 
 42
 370 U.S. at 435 n. 21, 82 S.Ct. at 1269 n. 21 (emphasis added).[4]
 
 
 43
 In keeping with Engel the Court struck down in Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), as violative of the first amendment's establishment clause, a Kentucky statute's requirement of posting a copy of the Ten Commandments from the Bible on the wall of each public classroom. The Court applied in Stone the three-part test of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971),[5] and determined that the "pre-eminent purpose" of the posting in the classroom was "plainly religious in nature," and had "no secular legislative purpose." 449 U.S. at 41, 101 S.Ct. at 193. The Stone Court, divided five to four, noted that the only potential effect of posting of the Ten Commandments was "to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments," and that this had the official support of the state for a religious purpose. Id. at 42, 101 S.Ct. at 194.
 
 
 44
 The Supreme Court recently considered another establishment clause challenge to a state requirement imposed on a daily basis in a classroom setting in Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). A one minute period of silence was mandated in all public schools in Alabama "for meditation or voluntary prayer." Id. at 40, 105 S.Ct. at 2481. The parents of children in kindergarten to third grade challenged the act, which was held to violate the first amendment in light of legislative history and a prime sponsor's testimony that the law was "an effort to return voluntary prayer to our public schools." Id. at 43, 105 S.Ct. at 2483. Again, the Court began its analysis of the constitutional issue by considering the Lemon criteria, acknowledging that "a statute that is motivated in part by a religious purpose may satisfy the first criterion." Id. at 56, 105 S.Ct. at 2490 (citing Abington School Dist. v. Schempp ). The Court emphasized that the Alabama statute was "wholly religious" in character and had "no secular purpose." See id. at 56, 58, 105 S.Ct. at 2490 (emphasis in original).[6] The decision in Wallace did not prevent a student "from engaging in voluntary prayer during an appropriate moment of silence during the schoolday;" id. at 59, 105 S.Ct. at 2491,[7] but held the Alabama statute to be unconstitutional, because it was essentially a sham designed to inject daily prayer in the public school classrooms. The Court also noted the particular impact of daily classroom activity on children in their formative years. See id. at 60 n. 51, 105 S.Ct. at 2492 n. 51.
 
 
 45
 Most recently, in Grand Rapids School District v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (another five to four split in the Court), the Court found a "shared time" program involving public school students to be violative of the establishment clause, because those who furnished the classrooms were "pervasively sectarian" religious schools. 473 U.S. at 385, 105 S.Ct. at 3223. The Court, in so holding, emphasized a fear of "inculcating particular religious terms or beliefs," and felt that the program might "provide a crucial symbolic link between government and religion ... at least in eyes of impressionable youngsters." Id. (emphasis added). In addition, the Court felt in Ball that the program might have the effect of providing a state subsidy to religion. "State-sponsored indoctrination" was the fear and basis of Ball, 473 U.S. at 385, 105 S.Ct. at 3224. See also Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).
 
 
 46
 An examination of these Supreme Court cases involving prayer, meditation, or posting of religious expression in the public schoolrooms indicates that the Court has been concerned throughout, as in McCollum, with (1) regularly scheduled or persistent religious expressions, (2) in a classroom setting, (3) officially sponsored or sanctioned content initiated by school authorities, which are (4) directed to students, primarily those of formative years. When a majority of these factors have been present, the Supreme Court has found the practice or statute to be violative of the first amendment. None of the above factors are present in this case.
 
 
 47
 First, the invocations and benedictions are not recited daily or regularly throughout the school year; they occur only once a year. Second, the setting is not a classroom or academic facility or during school hours; the ceremonies take place in athletic facilities after the school year has ended. Third, school authorities place no official sanction on the content of the invocations and benedictions. At neither school do the school authorities determine or even review the content of the remarks or participate in delivering them. Fourth, the audience is comprised largely of adults and graduating seniors, who are much less impressionable than children in their formative years. In sum, the facts of this case demonstrate the absence of any pedagogical or proselytizing purpose or effect, and a negligible role of school authorities.
 
 
 48
 I conclude that none of the school cases mentioned would direct in the instant situations a conclusion that once a year, outside the classroom, uncontrolled as to content, recitations of an invocation and/or benediction with the mention of God, Lord or Deity are unconstitutional. Here there is, at most, a kind of acknowledgment of religion in a brief part of an annual commencement ceremony, which takes place outside of any classroom setting, and is not directed towards influencing young children at a formative period.
 
 
 49
 A focus on cases outside of the context of the public school classroom leads to the same conclusion. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), was described in Ball as establishing a three-part test that "guides '[t]he general nature of our inquiry in this area.' " See 473 U.S. at 382, 105 S.Ct. at 3222. These tests "serve only as guidelines" and have no "precise limits." Id. at 383, 105 S.Ct. at 3222; see also Meek v. Pittenger, 421 U.S. at 359, 95 S.Ct. at 1760. The first part of the Lemon test questions whether the "statute [has] a secular legislative purpose." 403 U.S. at 612, 91 S.Ct. at 2111. There is no statute involved in this case; at issue is a practice of the school board acquiescing in the commencement program's having both an invocation and a benediction. The joint stipulation recognizes that some might view the invocation and/or benediction as having a religious effect while others would view it as entirely ceremonial. To the extent that the invocation and benediction are essentially ceremonial, they must pass muster under the first part of Lemon. A practice that is motivated only "in part by a religious purpose may satisfy the first criterion." Wallace v. Jaffree, 472 U.S. at 56, 105 S.Ct. at 2490. As the parties in this case have stipulated, saying a nonprescribed invocation or a benediction at a commencement clearly has both a secular and a nonsecular purpose. The words, "invocation" and "benediction" have dictionary definitions that describe the terms in both a secular and a nonsecular way.[8] The secular purpose of formally opening and closing the ceremonies is, moreover, a genuine secular purpose, unlike the practice in Stone, in which an avowed secular purpose could not disguise an undeniably wholly religious purpose. See Stone, 449 U.S. at 41, 101 S.Ct. at 193.
 
 
 50
 The second prong of the Lemon test concerns whether the practice has the primary effect of advancing religion. 403 U.S. at 612, 91 St.Ct. at 2111. The subordinate nature of the invocation and benediction, which last approximately two minutes in commencement ceremonies that take place only once a year, coupled with student control and the absence of faculty or board sanctioned content indicates that the primary effect does not advance religion. A fair comparison with the activity in question is the giving of a prayer by a Presbyterian chaplain, chosen by a legislative council of the Nebraska legislature, at the daily opening of legislative sessions. The Supreme Court found this practice in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), to be constitutional. This prayer given by a state paid Chaplain was analyzed as a tradition long recognized and "no real threat to the Establishment Clause" with "no more potential for establishment than the provision of school transportation" in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), or "tax exemptions for religious organizations" in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Marsh, 463 U.S. at 791, 103 S.Ct. at 3336. Chief Justice Burger, speaking for the Court in Marsh, observed that delegates to the constitutional convention "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's 'official seal of approval on one religious view.' " Id. at 792, 103 S.Ct. at 3336. He went on to state that "the Founding Fathers looked at invocations as 'conduct whose ... effect ... harmonize[d] with the tenets of some or all religions.' McGowan v. Maryland, 366 U.S. 420, 442, [81 S.Ct. 1101, 1113, 6 L.Ed.2d 393] (1961)." Id. at 792, 103 S.Ct. at 3336 (emphasis added). Adults, such as plaintiffs here, were not viewed in Marsh as "readily susceptible to 'religious indoctrination.' " 463 U.S. at 792, 103 S.Ct. at 3336. Prayers said in the form of an invocation in Marsh were specifically and obviously sanctioned by the state, were "in the Judeo-Christian tradition"[9], and were ruled to be constitutional. Id. at 793, 795, 103 S.Ct. at 3337, 3338. Our courts are also opened daily by invocation of a prayer or a blessing, "God save the United States and this Honorable Court." I perceive no reason why the practices in dispute here should be considered to violate the establishment clause in light of Marsh and the second criterion of Lemon.
 
 
 51
 Finally, the circumstances present would seem to fit within the context of Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), in which the display of a creche, owned by the City of Pawtucket, Rhode Island, and erected by the City in the shopping area, was held not to violate the establishment clause. The Court analyzed the activity in light of Lemon and determined that the display had a secular purpose, coupled with an undeniable religious import. As discussed above, a secular purpose suffices even if a religious purpose also exists. See, e.g., Wallace v. Jaffree, 472 U.S. at 56, 105 S.Ct. at 2490; Lynch, 465 U.S. at 680-81, 104 S.Ct. at 1362-63. The principal purpose of the creche, moreover, was not deemed to be advancement of the Christian faith, and finally, the Court found no excessive entanglement of government with religion. Lynch, 465 U.S. at 683-85, 104 S.Ct. at 1364-65. The Lynch Court also focused on the creche scene "in the context of the Christmas season." Id. at 679, 104 S.Ct. at 1362 (emphasis added); see also American Civil Liberties Union v. City of Birmingham, 791 F.2d 1561, 1566-67 (6th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986) (distinguishing Lynch on the basis of the context of a creche scene, which stood alone rather than being surrounded by secular decorations like the creche in Lynch ). Considering the context of the invocation and benediction in this case, I note that the remarks at issue were short, lasting a very short time in ceremonies of approximately 75 minutes, and took place in the context of otherwise wholly secular ceremonies, outside of the school building and after the regular school year. The context was neither religious nor pedagogical.
 
 
 52
 The principles set out in Lynch would seem clearly to indicate that no constitutional violation occurred in this case despite the content of the invocations and benedictions. I maintain that the content is not material because the school officials had no part in determining what was said or to be said or even who was to say the invocation and blessing at the respective school commencements. These facts demonstrate no motivation to advance religion or any particular religion. As the Supreme Court asserted in Marsh, under these circumstances, which indicate no exploitation of an opportunity to advance any one religion, "the content of the prayer is of no concern." Marsh, 463 U.S. at 794-95, 103 S.Ct. at 3337-38.
 
 
 53
 Concerning the last prong of the Lemon test, the brief recitation of an invocation and a benediction under the stipulated circumstances do not involve any excessive entanglement between church and state. State funds are not being used or diverted for religious purposes. The occasion was clearly a ceremonial one and not a classroom situation.
 
 
 54
 Finally, I note that had the speaker or leader at the time and place of the invocation read or led the audience in singing these words: "My Country 'Tis of Thee" or "Our Father's God to Thee, Author of Liberty," I doubt that this court, or any other, would find this activity unconstitutional. Had the speaker read, or guided the audience in a benediction with Irving Berlin's famous words, "God Bless America," or Julia Ward Howe's opening expression in the Battle Hymn of the Republic referring to the "glory of the Lord," again I doubt any finding of constitutional offense. These words in favorite songs, used at innumerable public ceremonies, including graduation ceremonies, contain plain and repeated reference to the Deity and ask His Blessing or give thanks for His guidance and assistance. They are both a form of invocation and benediction which in content is known in advance; yet they do not violate the first amendment. The remarks used to open and close the ceremonies in this case are no more violative of the constitution than are these expressions referring to the Deity.
 
 
 55
 Appellants have attempted to distinguish such songs from the remarks used at these commencement ceremonies on the basis that the remarks were "prayers." They emphasize that prayer is inherently religious and argue that the invocations and benedictions at issue are flawed simply because they are "prayers." The Supreme Court, on the other hand, has declared that "[f]ocus[ing] exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause," and the Court has directed that such a narrow focus is erroneous; courts must consider the whole context in which the activity takes place. See Lynch, 465 U.S. at 680, 104 S.Ct. at 1362. Appellants' narrow focus on the religious nature of prayer in this context conflicts with Lynch. The Court in Marsh, moreover, upheld the use of prayer to open legislative sessions. See 463 U.S. at 795, 103 S.Ct. at 3338. Saying a prayer does not violate the establishment clause simply by virtue of being a prayer used at a public function, as appellants would suggest.
 
 
 56
 For these reasons, in addition to those well expressed by Judge Gibson, I would AFFIRM the decision of the district court.
 
 
 
 [1]
 At the June 6, 1985, Plainwell commencement, the text of the invocatory prayer was as follows:
 "Heavenly Father, we ask your blessing upon all of us who are gathered here this evening. We thank you for the many gifts you have given us ... the gifts of families, teachers, and friends who care enough to be present with us tonight, and the gifts of knowledge, love, and freedom that have helped us to develop into the people we are. We also thank you for your constant presence in our lives, acknowledged in the words of the philosopher, Kahlil Gibran.
 'Look about you and you shall see God playing with your children. And look in space; you shall see Him walking in the cloud, outstretching His arms in the lightning and descending in rain. You shall see Him smiling in flowers, then rising and waving His hands in trees.'
 We pray that your guidance which has helped us reach this important milestone in our lives will continue throughout our future. In closing, I would like to offer this ancient prayer in the name of our graduating class and hope that at least one small part of it will be remembered by each one of us here tonight.
 'Lord, make us instruments of Thy peace; where there is hatred, let us bring love; where there is injury, pardon; where there is doubt, faith; where there is despair, hope; where there is darkness, light; and where there is sadness, joy. O Divine Master, grant that we may not so much seek to be consoled, as to console; to be understood, as to understand; to be loved, as to love; For it is in giving that we receive; it is in pardoning that we are pardoned, and it is in dying that we are born to eternal life.' AMEN"
 
 
 [2]
 At the May 31, 1985, Portage Central commencement, the invocation and the benediction were delivered by a Lutheran minister. The text of the invocation was as follows:
 "We thank you for all our gifts, for these young people here this evening, for the gifts of community and school, of minds and exploration and discovery, for your mercy, and for your love and we ask your blessing upon us now and always through Christ our Lord.
 AMEN"
 At earlier commencement exercises at Portage Central, invocations have included a statement that one must keep Jesus Christ as one's savior.
 
 
 [3]
 See Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)
 
 
 [4]
 Graham v. Central Community School Dist. of Decatur, 608 F.Supp. 531 (S.D.Iowa 1985)
 
 
 [5]
 For an excellent discussion of civil religion as a concept, see Note, Civil Religion and the Establishment Clause, 95 Yale L.J. 1237 (1986). In this Note, Mr. Mirsky traces both the theoretical underpinnings and legal ramifications of civil religion in America
 
 
 [1]
 The district court used these words to describe the choice of a participating minister at the Portage High School commencement
 
 
 [2]
 Kahlil Gibran is a Syrian poet, novelist, and essayist, who was largely influenced by the Bible and whose works were often deeply religious and mystical
 
 
 [3]
 The judge found that the case was not moot because it was "capable of repetition, yet evading review." No defendant challenges this finding
 
 
 [4]
 The Court reached a decision similar to Engel in Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), which concerned a daily reading in public school classrooms of verses from the Bible, but with the right of a child, on request, to be excused
 Justice Clark, writing for the Court, stated:
 The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself. This background is evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, "So help me God." Likewise each House of the Congress provides through its Chaplain an opening prayer, and the sessions of this Court are declared open by the crier in a short ceremony, the final phrase of which invokes the grace of God.
 Id. at 213, 83 S.Ct. at 1566.
 
 
 [5]
 Lemon did not concern prayer or Bible reading in public schools, but established a three-pronged analysis for establishment clause cases: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances or inhibits religion, ... finally, the statute must not foster 'an excessive entanglement with religion.' " Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111 (citations omitted)
 
 
 [6]
 Justice Powell in his concurring opinion in Wallace emphasizes this part of the holding. See 472 U.S. at 64-66, 105 S.Ct. at 2491 (Powell, J., concurring). He particularly noted that to meet the first criterion of Lemon, and thus be unconstitutional, an activity sponsored by the state must be "entirely motivated by a purpose to advance religion." Id. at 64 n. 6, 105 S.Ct. at 2494 n. 6 (emphasis in original)
 Justice O'Connor's concurrence in Wallace also made clear that Lemon's "endorsement test does not preclude government from acknowledging religion or from taking religion into account...." Id. at 70, 105 S.Ct. at 2497 (O'Connor, J., concurring).
 Now Chief Justice Rehnquist stated in dissent that "the Lemon test proscribes state action that has a sectarian purpose or effect, or causes an impermissible governmental entanglement with religion." 472 U.S. at 108, 105 S.Ct. at 2517 (Rehnquist, J., dissenting). He found no violation of first amendment values in Wallace.
 
 
 [7]
 The Court acknowledged, however, that "for some persons meditation itself may be a form of prayer." 472 U.S. at 59 n. 47, 105 S.Ct. at 2491 n. 47
 
 
 [8]
 Invocation is defined as "the action or an act of petitioning for help or support: a prayer of entreaty." Benediction is defined as "to praise, speak well: an expression or utterance of blessing or good wishes: the invocation of a blessing on persons or things being dedicated to God: as, the short blessing pronounced by a clergyman with which public worship is concluded ..." See Webster's Third New International Dictionary at 203, 1190 (1966)
 
 
 [9]
 Although, as discussed, content is not the appropriate focus for our analysis, since the majority emphasizes the content of the invocations at issue and decries the use of the "language of Christian theology" and the invocation of the "name of Jesus as the Savior," I would note in response that the prayers said daily by the United States Senate chaplain often contain language that would offend the majority's standards. The Senate chaplain has often used in his prayers and/or invocations, for example, expressions such as "We pray this in the name of our Lord and Savior, Jesus Christ," or "in Jesus' name," and has also invoked the name, "God of Abraham, Isaac, and Israel, God of our Lord Jesus Christ." See Prayers Offered by The Chaplain of the Senate of the United States--Reverend Richard C. Halverson, S.Doc. No. 9843, 98th Cong., 2d Sess. (1984)
 That these invocations pass constitutional muster according to Marsh indicates, it seems to me, a critical flaw in the majority's anaylsis. The mention of the Deity, even in the Christian context, in the invocation and benediction at issue, are not of critical import as indicated in the constitutional practices of the Senate chaplain.