**Daniel WEISMAN, personally and as next friend of Deborah Weisman**

v.

**Robert E. LEE, individually and as principal of the Nathan Bishop Middle School; Thomas Mezzanotte, individually and as principal of Classical High School; Joseph Almagno, individually and as Superintendent of the Providence School Department; Vincent McWilliams; Robert DeRobbio; Mary Batastini; Albert Lepore; Roosevelt Benton; Mary Smith Anthony Caprio; Bruce Sundlun and Roberto Gonzalez, individually and as members of the Providence School Committee.**

Civ. A. No. 89–0377B.

United States District Court,
D. Rhode Island.

Jan. 9, 1990.

Sandra A. Blanding, Revens & DeLuca, Ltd., Warwick, R.I., for plaintiffs.

Joseph A. Rotella, Providence, R.I., for defendants.

Amy Adelson, Lois Waldman, Marc D. Stern, Jeremy S. Garber, New York City, amicus curiae for American Jewish Congress.

OPINION

FRANCIS J. BOYLE, Chief Judge.

The issue presented is whether a benediction or invocation which invokes a deity delivered by clergy at an annual public school graduation ceremony violates the first amendment of the United States constitution. This Court finds that because a deity is invoked, the practice is unconstitutional under the Establishment Clause of the first amendment as construed by the United States Supreme Court.

## I. FACTS [1]

Each June, the Providence School Committee and Superintendent of Schools for the City of Providence sponsor graduation or promotion ceremonies in the city's public middle and high schools. The graduation ceremonies for high school students are generally held off school grounds, usually at Veterans Memorial Auditorium, which the Providence School Department rents for the occasion. Other sites have also been used. Middle school promotion ceremonies usually take place on school property, at the schools themselves.

The Providence School Committee and the Superintendent permit public school principals to include invocations and benedictions, delivered by clergy, in the graduation and promotion ceremonies. Over the past five or six years, most, but not all, of the public school graduation and promotion ceremonies have included invocations and benedictions. The practice has in fact been followed for many years.

The Assistant Superintendent of Schools has distributed to school principals a pamphlet entitled "Guidelines for Civic Occasions" as a guideline for the type of prayers to be used at the ceremonies. The pamphlet is prepared by the National Conference of Christians and Jews, a national organization with an office in Providence. The guidelines suggest methods of composing "public prayer in a pluralistic society," stressing "inclusiveness and sensitivity" in the structuring of non-sectarian prayer. The guidelines do not suggest the elimination of reference to a deity as appropriate.

Plaintiff Daniel Weisman's daughter, Deborah, was to graduate from Nathan Bishop Middle School, a public junior high school in Providence, in June of 1989. The ceremony was planned by two teachers from the school, and was to be held on the school grounds. Part of the program for that day included an invocation and benediction delivered by Rabbi Leslie Gutterman of the Temple Beth El of Providence. Four days before the ceremony was to take place, Plaintiff filed a motion for a temporary restraining order seeking to prevent the inclusion of prayer to a deity in the form of an invocation and benediction in the Providence public schools' graduation ceremonies. The day before the ceremony, this Court denied the Plaintiff's motion, essentially because the Court was not afforded adequate time to consider the important issues of the case.

On June 20, 1989, Deborah Weisman and her family attended the graduation ceremony for Deborah's class at Bishop Middle School. The principal of the school, Robert E. Lee, had received the "Guidelines for Civic Occasions" pamphlet from the Assistant Superintendent of Schools, and provided Rabbi Gutterman with a copy of the guidelines. Mr. Lee also spoke to Rabbi Gutterman to advise him that any prayers delivered at the ceremonies should be non-sectarian. Rabbi Gutterman was not told that he could not appeal to a deity.

Rabbi Gutterman began his invocation by addressing a deity in the first line of his text, and concluded with "Amen." [2] The benediction similarly opened with an appeal to a God, asked God's blessings, gave thanks to a Lord, and concluded with

---

**1.** The parties have filed an agreed statement of facts.

**2.** Both the invocation and benediction are examples of elegant simplicity, thoughtful content, and sincere citizenship. The full text of Rabbi Gutterman's invocation is as follows:

God of the Free, Hope of the Brave:

For the legacy of America where diversity is celebrated and the rights of minorities are protected, we thank You. May these young men and women grow up to enrich it.

For the liberty of America, we thank You. May these new graduates grow up to guard it.

For the political process of America in which all its citizens may participate, for its court system where all can seek justice we thank You. May those we honor this morning always turn to it in trust.

For the destiny of America we thank You. May the graduates of Nathan Bishop Middle School so live that they might help to share it.

May our aspirations for our country and for these young people, who are our hope for the future, be richly fulfilled.

AMEN

"Amen."[3] The parties agree that Rabbi Gutterman's invocation and benediction were prayers.[4]

Deborah Weisman continues to attend public school in the city of Providence. She is now a freshman at Classical High School in Providence. Plaintiff now seeks a permanent injunction to prevent the inclusion of invocations and benedictions in the form of prayer in the promotion and graduation ceremonies of the Providence public schools. Plaintiff's amended complaint names Principal Lee, the superintendent of Providence public schools, the principal of Classical High School, and the members of the Providence School Committee as defendants.

The parties agree resolution of the case is governed by the first amendment of the United States Constitution, specifically the Establishment Clause.[5] It is to that law that we now turn.

## II. THE ESTABLISHMENT CLAUSE

"The [Supreme] Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v.*

*Aguillard,* 482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987). Since the landmark 1962 decision of *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the Supreme Court has steadfastly required that the schoolchildren of America not be compelled, coerced, or subtly pressured to engage in activities whose predominant purpose or effect was to advance one set of religious beliefs over another, or to prefer a set of religious beliefs over no religion at all.[6] God has been ruled out of public education as an instrument of inspiration or consolation.

This vigilance is based upon the perceived sensitive nature of the school environment and the apprehended effect of state-led religious activity on young, impressionable minds. *Grand Rapids School District v. Ball,* 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985); *Edwards,* 482 U.S. at 584, 107 S.Ct. at 2577. "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the stu-

**3.** The following is the full text of Rabbi Gutterman's benediction:

O God, we are grateful to You for having endowed us with the capacity for learning which we have celebrated on this joyous commencement.

Happy families give thanks for seeing their children achieve an important milestone. Send Your blessings upon the teachers and administrators who helped prepare them.

The graduates now need strength and guidance for the future. Help them to understand that we are not complete with academic knowledge alone. We must each strive to fulfill what You require of us all: To do justly, to love mercy, to walk humbly.

We give thanks to You, Lord, for keeping us alive, sustaining us and allowing us to reach this special, happy occasion.

AMEN

**4.** Webster's Dictionary defines prayer as "a solemn and humble approach to Divinity in word or thought usu[ally] involving petition, confession, praise or thanksgiving." A benediction is defined as "the invocation of a blessing on persons or things being dedicated to God." An invocation is "a prayer of entreaty that is

usu[ally] a call for the divine presence and is offered at the beginning of a meeting or service of worship." Webster's Third New International Dictionary (unabridged), G & L Merriam Co., Springfield, Massachusetts (1981).

**5.** The first amendment provides in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I.

**6.** In *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court summarized the Establishment Clause in these oft-repeated words:

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion ... Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations, or groups, and vice versa.

330 U.S. at 15–16, 67 S.Ct. at 511–12.

dent and his or her family." *Edwards*, 482 U.S. at 584, 107 S.Ct. at 2577.

Under the Establishment Clause, the Court has struck down state statutes that required a daily Bible reading before class (*Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)), or required that a copy of the Ten Commandments be posted in every classroom (*Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980)), or required the recitation of a "denominationally neutral" prayer at the beginning of the school day (*Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962)), or statutes which authorized a daily moment of silence expressly for prayer (*Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)). In virtually all of these cases, the Court acknowledged that while "[w]e are a religious people whose institutions presuppose a Supreme Being," (*Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952)), the Establishment Clause of the first amendment was intended to prevent a State from becoming involved in leading its citizens, however young, in appeals to or adoration of a deity.

The Supreme Court "consistently has applied the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) to determine whether a particular state action violates the Establishment Clause of the Constitution." *Edwards*, 482 U.S. at 597, 107 S.Ct. at 2584 (Powell, J. concurring); *Grand Rapids School District*, 473 U.S. at 383, 105 S.Ct. at 3222 (1985) ("We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children"). An evaluation of the authorized practice of the Providence School Committee under the *Lemon* test is necessary, "mindful of the particular concerns that arise in the context of public elementary and secondary schools." *Edwards*, 482 U.S. at 585, 107 S.Ct. at 2578.

## III. THE LEMON TEST

The *Lemon* test reviews governmental actions using three prongs: "First, the [practice] must have a secular ... purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; [third], the [practice] must not foster 'an excessive entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citations omitted). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards*, 482 U.S. at 583, 107 S.Ct. at 2577.

The second prong of the *Lemon* analysis examines whether the effect of the action violates the Establishment Clause. It is here that the invocation and benediction practice runs afoul of the first amendment. Because this Court finds that the Providence School Committee's practice fails to meet constitutional scrutiny under the second prong of the *Lemon* test, it is not necessary to discuss the first and third parts of the test.

*The Second Lemon Prong: Principal Effect Must Neither Advance Nor Inhibit Religion*

One method of determining whether a state action advances or inhibits religion is to determine whether the action creates an identification of the state with a religion, or with religion in general. "Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines." *Grand Rapids School District*, 473 U.S. at 389, 105 S.Ct. at 3225.

The particular circumstances of each government action are critical in the examination of the effect that any church-state identification may have on its audience. For example, in *Grand Rapids School District v. Ball*, the Court distinguished between two of its earlier precedents. In *McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Court held that religious instruction could not be held on public school premises as a part of the school program, even though the instruction was conducted by non-public school personnel and partic-

ipation was voluntary. In *Zorach v. Clauson*, however, the Court held that a similar program that was conducted off school premises passed constitutional scrutiny. 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). As the Court explained in *Grand Rapids*, "[t]he difference in symbolic impact helps to explain the difference between the cases. The symbolic connection of church and state in the *McCollum* program presented the students with a graphic symbol of the 'concert or union or dependency' of church and state ... This very symbolic union was conspicuously absent in the *Zorach* program." *Grand Rapids School District*, 473 U.S. at 391, 105 S.Ct. at 3226.

Similarly, in *Grand Rapids School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Court invalidated a "Shared Time" program in which a school district provided classes to nonpublic school students at public expense in classrooms located in and leased from the nonpublic schools. The Court emphasized that students attending both public and nonpublic school classes within the same building "would be unlikely to discern the crucial difference between the religious school classes and the 'public school' classes...." 473 U.S. at 391, 105 S.Ct. at 3226. The Court pointed out that even the students who were able to recognize the difference between the two classes "would have before [them] a powerful symbol of state endorsement and encouragement of the religious beliefs taught in the same class at some other time during the day." *Id.* at 392, 105 S.Ct. at 3227.

In this case, the benediction and invocation advance religion by creating an identification of school with a deity, and therefore religion. The invocation and benediction present a "symbolic union" of the state and schools with religion and religious practices. While the fact that graduation is a special occasion distinguishes this school day from all others, the uniqueness of the day could highlight the particular effect that the benediction and invocation

may have on the students. The presence of clerics is not by itself determinative. It is the union of prayer, school, and important occasion that creates an identification of religion with the school function. The special nature of the graduation ceremonies underscores the identification that Providence public school students can make.[7] "This effect—the symbolic union of government and religion in one sectarian enterprise—is an impermissible effect under the Establishment Clause." *Id.*

Closely related to the identification analysis is examination which determines whether the effect of the governmental action is to endorse one religion over another, or to endorse religion in general. The response is a foregone conclusion; that is, the reference to a deity necessarily implicates religion. *See Grand Rapids School District*, 473 U.S. at 389, 105 S.Ct. at 3225 ("If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated"). In recent cases, the "endorsement" inquiry has come to the fore of *Lemon* analysis. *County of Allegheny v. American Civil Liberties Union*, — U.S. ——, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989). Therefore, "an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices. The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years." *Grand Rapids School District*, 473 U.S. at 390, 105 S.Ct. at 3226. In this case, the Providence School Committee has in effect endorsed religion in general by authorizing an appeal to a deity in public school graduation ceremonies. The invocations and benedictions convey a tacit preference for

---

7. Of course, the reverse might also be true. Students might conclude that a deity is not an important part of their lives. This Court is not permitted to ruminate concerning the aptness of this possible result as the Establishment Clause is currently construed.

some religions, or for religion in general over no religion at all. Schoolchildren who are not members of the religions sponsored, or children whose families are non-believers, may feel as though the school and government prefer beliefs other than their own.

It is of no significance that the invocation and benediction are supposed to be nondenominational, or that participation or even recognition of the prayers is voluntary. In *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the Court invalidated a New York statute which required a short, nondenominational prayer to be recited at the beginning of each school day. "Neither the fact that the prayer may be denominationally neutral," the Court wrote, "nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause, as it might from the Free Exercise Clause, of the First Amendment...." 370 U.S. at 430, 82 S.Ct. at 1266–67.

In summary, the practice of having a benediction and invocation delivered at public school graduation ceremonies has the effect of advancing religion. The special occasion of graduation coupled with the presence of prayer creates an identification of governmental power with religious practice. Finally, the practice of including prayer may have the effect of either endorsing one religion over others, or of endorsing religion in general. For these reasons, the practice of providing guidelines for "non-sectarian" prayer fails to withstand constitutional scrutiny.

Defendants rely heavily on *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In that opinion, the Supreme Court upheld the Nebraska state legislature's opening of each session with a prayer led by a chaplain who was paid by the State. The Court noted that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786, 103 S.Ct. at 3333. The Court noted the long history, dating back to the Continental Congress, of opening legislative sessions with a prayer offered by a chaplain who was paid by the state. This unique "unambiguous and unbroken history" led the Court to hold that the drafters of the Constitution did not intend the first amendment to bar such legislative prayers.[8]

Defendant argues that this court should follow the reasoning of the Sixth Circuit Court of Appeals in *Stein v. Plainwell Community Schools*, 822 F.2d 1406 (6th Cir.1987), in which the court extended *Marsh* to include benediction and invocations at public school commencement ceremonies. In *Stein*, the Court of Appeals held that annual high school graduation exercises were analogous to the legislative and judicial sessions in *Marsh*. The Court of Appeals found that the invocations and benedictions at graduation provided less opportunity for religious indoctrination or peer pressure than did classroom prayer for two reasons: first, the public nature of the ceremonies and the usual presence of parents acted as a buffer from religious coercion; second, the prayers were not led by a teacher or school official, thus they did not implicate the teacher-student relationship. 822 F.2d at 1409. The Court of Appeals did, however, find that the particu-

---

**8.** Like legislative prayer, religious involvement in American education has a long history. Beginning in colonial times, the first schools in this country were religiously motivated. *See generally Lemon v. Kurtzman*, 403 U.S. at 645, 91 S.Ct. at 2127 (opinion of Brennan, J.) Public school education was not begun until about 1840, nearly seventy years after the Declaration of Independence, and a half century after the adoption of the Constitution. The purpose of colonial schools was to ensure that children could read and understand the principles of Biblical faith. H.G. Good, *A History of American Education*, 40–41 (1975). Many of the char-

ters of America's oldest colleges and universities expressly state that the institutions' purpose was to spread the Christian faith. For example, Dartmouth College was founded to "spread[ ] Christian knowledge among" American Indians "with a view to their carrying the gospel in their own language." Charter of Dartmouth College, (1769). The point is that at the time the Constitution was adopted, there really was no public education except that intimately connected with religious purpose. There is no factual basis for an historical argument that the first amendment was intended by the drafters to isolate religion from education.

lar benediction and invocation challenged in *Stein* were unacceptable under the *Marsh* holding because they contained language that was based on Christian theology and thus were not nonsectarian. *Id.* at 1410. As the Supreme Court did in *Marsh,* the *Stein* court did not apply the *Lemon* test.[9]

*Stein's* extension of the *Marsh* rationale is not persuasive. The *Marsh* holding was narrowly limited to the unique situation of legislative prayer. The clearest indication of this fact is that the *Marsh* decision did not use the *Lemon* test in its review of legislative benedictions. Since the *Lemon* test was first developed in 1971, every case involving the issue of prayer in school has used its analysis. *Edwards v. Aguillard,* 482 U.S. 578, 583 n. 4, 107 S.Ct. 2573, 2577 n. 4, 96 L.Ed.2d 510 ("The *Lemon* test has been applied in all cases since its adoption in 1971, except in *Marsh v. Chambers");* *Grand Rapids School District v. Ball,* 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) ("We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children"). *Marsh's* unique exception to the *Lemon* test would most likely not be applied to school prayer cases, which on the basis of existing precedent requires use of the *Lemon* analysis. When the practice of the Providence School Committee is reviewed under *Lemon,* it fails to withstand Establishment Clause scrutiny, *supra.*

Extending the *Marsh* analysis to school benedictions is arguably unworkable because it results in courts reviewing the content of prayers to judicially approve what are acceptable invocations to a deity. *See Stein,* 822 F.2d at 1410 (reviewing language of invocation and benediction). What must follow is gradual judicial devel-

opment of what is acceptable public prayer. This result is as contrary to the requirements of the Establishment Clause as is legislative composition of an official state prayer. *See Engel,* 370 U.S. at 425, 430, 82 S.Ct. at 1264, 1266.

Finally, the non-sectarian guidelines used by the School Committee are not a means of rescue. They are useful in environments where prayer is permitted. Here, it is not the particular nature or wording of the prayers which implicates the first amendment—it is prayer at the ceremony which transgresses the Establishment Clause.

On every other school day, at every other school function, the Establishment Clause prohibits school-sponsored prayer. If the students cannot be led in prayer on all of those other days, prayer on graduation day is also inappropriate under the doctrine currently embraced by the Supreme Court.

It is necessary to explain what this decision does not do. First, "[n]othing in the United States Constitution as interpreted by this Court ... prohibits public school children from voluntar[y] [private] pray[er] at any time before, during, or after the school day," or anytime during the graduation ceremonies. *Wallace v. Jaffree,* 472 U.S. 38, 67, 105 S.Ct. 2479, 2495, 86 L.Ed.2d 29 (1985) (O'Connor, J. concurring). Second, nothing in this decision prevents a cleric of any denomination or anyone else from giving a secular inspirational message at the opening and closing of the graduation ceremonies. Counsel for plaintiff conceded at argument, as she must, that if Rabbi Gutterman had given the exact same invocation as he delivered at the Bishop Middle School on June 20, 1989 with one change—God would be left out—the Establishment Clause would not be implicated.[10]

---

9. The rationale of the *Stein* decision is far from clear precedent. The case was heard by three judges of the sixth circuit, and each judge wrote an opinion in the case. The opinion for the court adopted *Marsh,* did not apply *Lemon,* but found that language of the challenged prayers did not meet *Marsh's* requirement of nonsectarian prayer. The concurring opinion applied not only the *Marsh* standard, but also applied the *Lemon* test and found that while commencement prayer in general survived *Lemon* scruti-

ny, the language of the particular prayers in the case did not. The dissenting opinion agreed with much of the two majority opinions, but argued that all commencement prayers passed the *Lemon* test, including those in the *Stein* case.

10. Rabbi Gutterman could have delivered the following benediction:

For the legacy of America where diversity is celebrated and the rights of minorities are

The plaintiff here is contesting only an invocation or benediction which invokes a deity or praise of a God.

Finally, in the words of Justice Kennedy, "The case before [the court] illustrates better than most that the judicial power is often difficult in its exercise ... The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result." *Texas v. Johnson,* —— U.S. ——, 109 S.Ct. 2533, 2548, 105 L.Ed.2d 342 (1989) (Kennedy, J. concurring). The fact is that an unacceptably high number of citizens who are undergoing difficult times in this country are children and young people. School-sponsored prayer might provide hope to sustain them, and principles to guide them in the difficult choices they confront today. But the Constitution as the Supreme Court views it does not permit it. Choices are made in order to protect the interests of all citizens.[11] Unfortunately, in this instance there is no satisfactory middle ground. Neither the legislative, nor the executive, nor the judicial branch may define acceptable prayer. Those who are anti-prayer thus have been deemed the victors. That is the difficult but obligatory choice this Court makes today.

Plaintiff may prepare and present a form of judgment within ten days declaring that the inclusion of prayer in the form of invocations or benedictions at public school promotion or graduation exercises in the City of Providence is unconstitutional in violation of the first amendment and permanently enjoining the School Committee of the City of Providence, its agents or employees from authorizing or encouraging the use of prayer in connection with school graduation or promotion exercises.

SO ORDERED.

---

protected, we are thankful. May these young men and women grow up to enrich it.

For the liberty of America, we are thankful. May these new graduates grow up to guard it.

For the political process of America in which its citizens may participate, for its court system where all can seek justice we are thankful. May those we honor this morning always turn to it in trust.

For the destiny of America we are thankful. May the graduates of Nathan Bishop Middle School so live that they might help to share it.

May our aspirations for our country and for these young people, who are our hope for the future, be richly fulfilled.

11. Justice Brennan described the effect of the first amendment in his opinion for the Court in *Grand Rapids School District v. Ball:*

... For just as religion throughout history has provided spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects that have from time to time achieved dominance. The solution to this problem adopted by the Framers and consistently recognized by this Court is jealously to guard the right of every individual to worship according to the dictates of conscience while requiring the government to maintain a course of neutrality among religions, and between religion and nonreligion. Only in this way can we "make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary" and "sponsor an attitude on the part of government that shows no partiality to any one group and lets each flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 683–84, 96 L.Ed. 954 (1952). *Grand Rapids School District,* 473 U.S. at 382, 105 S.Ct. at 3221–22.