Daniel WEISMAN, etc.,
Plaintiff, Appellee,

v.

Robert E. LEE, et al.,
Defendants, Appellants.

No. 90–1151.

United States Court of Appeals,
First Circuit.

Heard May 10, 1990.

Decided July 23, 1990.

Joseph A. Rotella, Providence, R.I., for defendants, appellants.

Sandra A. Blanding, Warwick, R.I., for plaintiff, appellee.

Before CAMPBELL and TORRUELLA, Circuit Judges, and BOWNES, Senior Circuit Judge.

TORRUELLA, Circuit Judge.

This is an appeal from the United States District Court for the District of Rhode Island. The issue presented for review is whether a benediction invoking a deity delivered by a member of the clergy at an annual public school graduation violates the Establishment Clause of the First Amendment of the Constitution as construed by the Supreme Court under the second prong of the *Lemon* test. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971). The district court held that it did. 728 F.Supp. 68 (D.R.I.1990).

We are in agreement with the sound and pellucid opinion of the district court and see no reason to elaborate further.

*Affirmed.*

BOWNES, Senior Circuit Judge (concurring).

Although the district court wrote a very good opinion, which I join in affirming, I am compelled to make some additional comments of my own because of the significance of this case and the strong emotions that it and other Establishment Clause cases generate.[1]

---

1. I am troubled by a report in The Boston Globe that officials at a school in Rhode Island have intentionally violated Judge Boyle's ruling by having a prayer at graduation. Boston Globe, June 10, 1990 at 67. This blatant disregard for the law drew "howls of approval[,] applause, and cheers" at the graduation. Similar disobedience of the law has followed decisions in other recent prayer cases. See N.Y. Times, Sept. 2, 1989 at 1 (*Football Prayer Ban stirring Anger in South*) (disobedience of *Jager v. Douglas County School District,* 862 F.2d 824 (11th Cir.1989)).

I point out that there is formidable religious authority condemning prayer in public:

And when thou prayest, thou shall not be as the hypocrites are: for they love to pray standing in the synagogues and in the corners of the streets, that they may be seen of men.... when thou prayest, enter into thy closet, and when thou has shut the door, pray to thy Father in secret. But when ye pray, use not vain repetitions, as the heathen do: for they think they shall be heard for their much speaking.

Over three hundred and fifty years ago, Roger Williams was banished from the Massachusetts Bay Colony for, among other "heresies," arguing that the civil government should be completely separate from religion.[2] He travelled south and founded what became the state of Rhode Island, which was the first colony to require the separation of church and state.[3] Since that time the people of Rhode Island have been sporadically involved in probing the permissible intersections between religion and government. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (deciding *Robinson v. DiCenso*). Once again this volatile and troublesome issue is before us.

We are asked to determine whether the Establishment Clause prohibits public prayer at a public middle school[4] graduation ceremony. Broadly, this requires us to examine the text of the Constitution and interpret its meaning based on the various tools of constitutional analysis. In its narrowest aspect, we must examine Supreme Court Establishment Clause precedent to determine whether a prayer at a middle school graduation ceremony is similar enough to prayer in the classroom to be controlled by the Court's cases prohibiting school prayer. *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (daily moment of silence expressly for prayer); *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting of ten commandments in school rooms); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (daily Bible reading); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (daily prayer). Appellants claim that a graduation benediction is more like the legislative prayer approved in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and therefore the school prayer cases are not controlling.

## 1. THE TEXT OF THE CONSTITUTION.

I begin my discussion with an examination of the text of the Constitution. Unlike earlier political documents, such as the Declaration of Independence,[5] the Constitution is completely secular, neither invoking nor referring to "God" or any deity.[6] The First Amendment prohibits "laws respecting the establishment of religion." U.S. Const. amend. I.[7]

The scope of that prohibition has proven extremely difficult to delineate and implement in contemporary society. The words

---

Matthew 6: 5–7 (King James).

**2.** A contributing factor in his exile was his controversial interpretation of the Bible, which was the political as well as religious guide for the Puritans. Similarly, this case raises the subsidiary question of how to read the Constitution.

**3.** Charter of Rhode Island and Providence Plantations, July 8, 1663, *reprinted in Sources of Our Liberties* 162 (R. Perry ed. 1978).

**4.** A middle school, as the name implies, is the school that children attend after grade school and before high school.

**5.** *Amicus Curie* National Legal Foundation would have us read the religious imagery of the Declaration into the Constitution. There is no justification for such a reading. The omission of a reference to a Deity in the Constitution was not inadvertent; nor did it remain unnoticed. *Marsh*, 463 U.S. at 807, 103 S.Ct. at 3344 (Brennan, J., dissenting) (*quoting* Pfeffer, *The Deity in American Constitutional History*, 23 J. Church & State 215, 217 (1981)). In fact, it is a striking affirmation of the Establishment Clause.

**6.** In the Constitution of 1787, "religion" only appears in Article VI ("no religious test shall be required").

**7.** The Amendment has been applied to the states through the Fourteenth Amendment in *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Establishment Clause was applied to the states in *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). There was a dispute over whether the Congress that passed the Fourteenth Amendment thought that it would incorporate the Bill of Rights. This dispute focused on the weight that should be given to Congress's consideration of the "Blaine Amendment" after the Fourteenth Amendment had been enacted. The Amendment would have expressly applied language similar to the First Amendment to the states. *See also Abington*, 374 U.S. at 254–59, 83 S.Ct. at 1588–91 (Brennan, J., concurring) (discussing the incorporation of the Amendment). *See generally*, A. Meyer, *The Blaine Amendment and the Bill of Rights*, 64 Harv.L.Rev. 939 (1951).

of the Amendment give us some indication of its meaning. The use of the word "respecting" indicates that a broader sweep should be given to "establishment," thus prohibiting many actions that could lead to the establishment dist of religion. *County of Allegheny v. ACLU,* —— U.S. ——, 109 S.Ct. 3086, 3130, 106 L.Ed.2d 472 (1989) (Stevens, J., concurring in part, dissenting in part) ("'Respecting' means concerning or with reference to. But it also means with respect—that is 'reverence,' 'good-will,' .... Taking into account this richer meaning, the Establishment Clause, in banning laws that concern religion, especially prohibits those that pay homage to religion."); *see also Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111; *Engel,* 370 U.S. at 436, 82 S.Ct. at 1269. In addition, the use of "religion" rather than "church" implies a prohibition against more than merely an established national church. *See, e.g., Everson,* 330 U.S. at 31, 67 S.Ct. at 519 ("Madison could not have confused 'church' and 'religion' or 'an established church' and an establishment of religion.' "). Beyond these preliminary inquiries, the "plain meaning" of the text is of little help in determining results in this case, so we must turn to the interpretation and practice that has evolved throughout the past two hundred years.

In trying to create meaning from the Establishment Clause, courts and commentators have constructed various historical arguments. But historians have decidedly mixed views about what "establishment" meant to the framers. Judges and historians have been unable to agree about what ideas informed the writing of the Constitution,[8] what exactly occurred in the debates surrounding ratification (the specific intent of the framers),[9] or what impact the "religious character" of various post-ratification practices should have on the meaning we give to the Constitution.[10]

The Court has spent considerable time considering and debating the history of the religion clauses, and each time the results have been inconclusive. *Compare Wallace,* 472 U.S. at 79–84, 105 S.Ct. at 2501–04 (O'Connor, J., concurring) ("The primary issue raised by Justice Rehnquist's dissent

---

8. Extensive debate surrounds what exactly "the" framers of the Constitution meant or intended. At least three distinct major strands have been isolated, each identified with an individual: Jefferson, Williams and Madison. Jefferson focused on a "wall of separation between church and state" to protect the state from the church. *See, e.g., Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244 (1879); Letter from Thomas Jefferson to Nehemiah Dodge and others, A Committee of the Danbury Baptist Association (Jan. 1, 1802) *reprinted in* 5 P. Kurland, *The Founders' Constitution* 96 (1987); *see also Everson,* 330 U.S. at 28, 67 S.Ct. at 517; *But cf. Wallace,* 472 U.S. at 92, 105 S.Ct. at 2508 (Rehnquist, J., dissenting) ("The Establishment Clause has been expressly freighted of Jefferson's misleading metaphor for nearly 40 years.... He would seem to any detached observer as a less than ideal source of contemporary history as to the meaning of the religion clauses of the First Amendment."). Williams thought that a "hedge or wall of separation [should exist] between the garden of the church and the wilderness of the world" in order to protect religion from the corruption of the world. *See generally,* P. Miller, *Roger Williams: His Contribution to the American Tradition* 99 (1953). Madison's view was that competition among sects both religious and political was in everyone's best interest. Justice Rehnquist has tried to distinguish between Madison "as an advocate of sensible legislative compromise and not as an advocate of incorporating the Virginia Statute of Religious Liberty" to support the proposition that Madison believed the single intent of the amendment was to prevent the establishment of a national church (such as the Church of England). *Wallace,* 472 U.S. at 98, 105 S.Ct. at 2511 (Rehnquist, J., dissenting). This approach has been criticized. *See, e.g., Wallace,* 472 U.S. at 79, 105 S.Ct. at 2501 (O'Connor, J., concurring).

9. Legislative history is virtually non-existent for this provision. *Marsh,* 463 U.S. at 814, 103 S.Ct. at 3347 (Brennan, J., dissenting). *But see County of Allegheny,* 109 S.Ct. at 3129–30 (Stevens, J., concurring in part, dissenting in part); *Wallace,* 472 U.S. at 91–100, 105 S.Ct. at 2507–12 (Rehnquist, J., dissenting).

10. Religious practice in the nineteenth century is not a persuasive argument about the meaning of the Constitution because historians have noted that the various religious practices of the government in the nineteenth century were more expansive than at the time of ratification. Christmas and Thanksgiving became national holidays at that time, for example. *See generally* Botein, *Religious Dimensions of the Early American State reprinted in* R. Beeman, S. Botein and E. Carter, *Beyond Confederation: Origins of the Constitution and American National Identity* 315 (1987) (discussing the increase in religious practice by the government in the nineteenth century).

is whether the historical fact that our Presidents have long called for public prayers of thanks should be dispositive on the constitutionality of prayers in the public schools. I think not.") *with Wallace* 472 U.S. at 91–114, 105 S.Ct. at 2507–19 (Rehnquist, J., dissenting); *compare Marsh*, 463 U.S. at 786–92, 103 S.Ct. at 3333–36 *with Marsh*, 463 U.S. at 813–17, 103 S.Ct. at 3347–49 (Brennan, J., dissenting) (discussing the extent to which the practices of the First Congress reveal the intent behind and support interpretations of the Constitution); *compare Everson*, 330 U.S. at 8–16, 507–12 *with Everson*, 330 U.S. at 28–43, 67 S.Ct. at 517–25 (Rutledge, J., dissenting); *see also Engel*, 370 U.S. at 425–30, 82 S.Ct. at 1264–67. *See generally Abington*, 374 U.S. at 232–65, 83 S.Ct. at 1576–94 (Brennan, J., concurring) (scholarly discussion of the role of the history in interpreting the Establishment Clause). It is useless to rehash this continuing debate. The ground has been trodden so much that it is barren of meaning and persuasive power. The "historical record" is inconclusive on the various cross-currents in the minds of the framers. Because of the tangled and often conflicting historical record, it is unlikely that, as an empirical matter, we can ever know the original intention of the authors of the Constitution.[11] Even if we could reconstruct the framers' intent, that would not necessarily be determinative in this case, given our two hundred years of experience with the Constitution and changing circumstances. *See, e.g., County of Allegheny*, 109 S.Ct. at 3099 ("Perhaps in the early days of the republic [the prohibitions of the Establishment Clause] were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith such as Islam

or Judaism" (quotation and citation omitted)). *See generally Abington*, 374 U.S. at 232–65, 83 S.Ct. at 1576–94 (Brennan, J., concurring); T. Jefferson, *Autobiography reprinted in The Founders' Constitution* 85 ("The bill for establishing religious freedom ... meant to [include] within the mantle of its protection, the Jew and the Gentile, the Christian and the Mahometan, the Hindoo and Infidel of every denomination."). An additional facet of the problem of framers' intent is what was the framers' intention about their intent. Scholars have argued that the original intention of the framers was that their intentions were irrelevant to interpreting the Constitution. *See, e.g.,* H.J. Powell, *The Original Understanding of Original Intention*, 98 Harv.L.Rev. 885 (1985).

### 2. THE SCHOOL PRAYER CASES.

Although the Court may have sent confusing signals on the theoretical or historical underpinnings of the Establishment Clause, it has strictly and consistently interpreted the prohibitions of the Establishment Clause in cases involving prayer in the public schools. The Court

> has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student or his or her family.

*Edwards v. Aguillard*, 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987). The Court has consistently struck down laws or practices that allow or mandate forms of prayer in the schools,[12] and it has

**11.** The debate about the history of the Establishment Clause highlights problems of historical theory in the Court's opinions. Historians recover "facts" and, through selecting certain facts from the universe of available facts, construct narratives that explain a historical problem. Historical interpretations are not "facts" but rather are narratives drawn from the facts selected by the historian. *See generally,* H. White, *Interpretation in History, reprinted in* H. White,

*Tropics of Discourse* (1978); H. White, *Metahistory: The Historical Imagination in Nineteenth-Century Europe* (1973).

**12.** *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (daily moment of silence expressly for prayer); *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting of ten commandments in school rooms); *Abington School District v. Schempp*,

never allowed a prayer at a formal school function. *But see Board of Education v. Mergens,* —— U.S. ——, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (allowing Christian club as voluntary extracurricular activity at public school).

The appellants argue that this case is not controlled by the school prayer cases because graduation attendance is voluntary, graduation sometimes takes place off-campus, and it occurs only once a year. They contend that the prayers are acceptable under either the prevailing *Lemon* test or under the exception to that standard delineated in *Marsh v. Chambers.* Such arguments have been rejected by other courts. *See, e.g., Jager v. Douglas County School District,* 862 F.2d 824 (11th Cir.1989) (prohibiting prayer before high school football game and rejecting the use of *Marsh*), *cert. denied,* —— U.S. ——, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989); *Graham v. Central Community School Dist.,* 608 F.Supp. 531 (D.Iowa 1985) (prohibiting prayer at high school graduation and rejecting application of *Marsh*); *see also Schempp,* 374 U.S. at 224–25, 83 S.Ct. at 1572–73 ("[T]he fact that individual students may absent themselves ... furnishes no defense to a claim of unconstitutionality under the Establishment Clause."); *Engel,* 370 U.S. at 430, 82 S.Ct. at 1266 ("[T]he fact that the [prayer] on the part of students is voluntary can[not] serve to free it from the limitations of the Establishment clause.").

### 3. THE LEMON TEST.

In evaluating the acceptability of practices under the Establishment Clause, the Court has generally applied a derivative of the three-pronged *"Lemon"* test:

> First, the [practice] must have a secular purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, [it] must not foster 'an excessive government entanglement with religion.'

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971) (citations omitted). A practice or statute that fails to meet any of these requirements violates the Establishment Clause. *See Edwards,* 482 U.S. at 583, 107 S.Ct. at 2577. Only one Establishment Clause case since *Lemon* has not applied some form of this test. *Edwards v. Aguillard,* 482 U.S. 578, 583 n. 4, 107 S.Ct. 2573, 2577 n. 4, 96 L.Ed.2d 510 (1987) (referring to *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), which did not involve public schools); *see also County of Allegheny v. ACLU,* —— U.S. ——, 109 S.Ct. 3086, 3100 n. 4, 106 L.Ed.2d 472 (1989) (collecting cases that have used *Lemon* test); *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) ("We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children.").

The district court properly and carefully applied this test and determined that the practice of invocations and benedictions at school graduations ran afoul of the second, "effect," prong of the *Lemon* test.

### A. Secular Purpose

The secular purpose prong of *Lemon* requires us to determine whether the predominant purpose of the practice in question is secular. The question is not whether there is or could be any secular purpose, but rather whether the actual predominant purpose is to endorse religion. *Wallace,* 472 U.S. at 56, 105 S.Ct. at 2489; *see also Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368 ("The purpose prong ... asks whether the government's actual purpose is to endorse or disapprove of religion."). That requirement "is precisely tailored to the Establishment Clause's purpose of assuring that Government not intentionally endorse religion or religious practice." *Wallace,* 472 U.S. at 75, 105 S.Ct. at 2499 (O'Connor, J., concurring). In examining the secular purpose, the Court has examined whether the stated purpose is "sincere and not a sham." *See, e.g., Edwards,* 482 U.S. at 587, 107 S.Ct. at 2579 (Louisiana's creation science

374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (daily bible reading); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (daily prayer).

act, although purporting to foster "academic freedom," in fact did not have a secular purpose); *Stone,* 449 U.S. at 41, 101 S.Ct. at 193 ("[T]he Ten Commandments are undeniably a sacred text in the Jewish and Christian Faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact.").

Although reciting a prayer before a graduation ceremony might, as appellants argue, have the residual sectarian effects of solemnizing the occasion,[13] the primary purpose is religious. Specifically invoking the name and the blessing of "God" on the graduation. ceremony is a supplication and thanks to "God" for the academic achievement represented by the graduation and a hope for the continuation of such good fortune. It does not serve a purely or predominantly solemnizing function. A graduation ceremony does not need a prayer to solemnize it.

### B. Secular Effect

Justice O'Connor has tried to focus the secular effect discussion on the government's endorsement of religion: "What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). As the district court held, it is self-evident that a prayer given by a religious person chosen by public school teachers communicates a message of government endorsement of religion.

### C. Excessive Entanglement

The excessive entanglement prong prohibits actions that "may interfere with the independence of institutions." *Lynch,* 465 U.S. at 667, 104 S.Ct. at 1355 (O'Connor, J., concurring). In particular, this prong is concerned with the state impermissibly monitoring or overseeing religious affairs.

*Marsh,* 463 U.S. at 798–99, 103 S.Ct. at 3339–40 (*citing Lemon,* 403 U.S. at 614–22, 91 S.Ct. at 2112–16). For example, the Court struck down a provision of a zoning ordinance that allowed churches "veto" power over liquor licenses within 500 feet of the church. *Larkin v. Grendel's Den,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). Implicit in this prong, and central to any understanding of the First Amendment, is the belief that the government should not become involved with the determination of religious practice.

Although neither party strongly advances arguments on this prong, I am struck by the instances of entanglement in this case. In *Jager,* the court found no entanglement problem because the school did not monitor the content of the prayers or choose the speaker. *Jager,* 862 F.2d at 831. Here school officials did both. Appellants make much of the fact that the school has chosen to give a suitably non-denominational prayer because school officials distributed a pamphlet entitled "Guidelines for Civic Occasions." These guidelines suggest what kind of prayers should be written. This supervision of the content of the prayers by the school officials implicates the entanglement prong. The school is impermissibly involved in regulating the content of the prayer. In addition, unlike both *Stein* and *Jager,* school teachers chose the speaker who gave the prayer at graduation. This has the effect of involving those teachers in choosing among various religious groups, an activity that is surely prohibited by the Establishment Clause.

### 4. MARSH.

Recognizing the strictness of the *Lemon* test, the appellants urge that we follow the limited exception to the application of the test delineated in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019

---

**13.** It is ironic that many groups that advocate prayer (or "religious liberty"), argue that prayer has no religious intent or effect. They emphasize the "solemnizing function" of an invocation or benediction at graduation and other ceremonies. Inevitably, they analogize prayer to public situations where religion is a dead letter, such as the use of "God" on coins or the "under God" language in the Pledge of Allegiance, to support their position. I am surprised that religious groups would support an argument that explicitly relegates the value of religion in our society to the merely ceremonial.

(1983). In *Marsh,* the Supreme Court upheld the practice of the Nebraska Legislature to begin each legislative session with a prayer. *Marsh* was based on the "unique" and specific historical argument that the framers did not find legislative prayers offensive to the Constitution because the first Congress approved of legislative prayers. *Marsh,* 463 U.S. at 791, 103 S.Ct. at 3335.

That history and those special circumstances are not present at middle school graduations. The Court has specifically stated that "[s]uch a historical approach is not useful in determining the proper roles of church and state in public schools, since free public schools were virtually non-existent at the time the Constitution was adopted." *Edwards,* 482 U.S. at 583 n. 4, 107 S.Ct. at 2577 n. 4; *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 390 n. 9, 105 S.Ct. 3216, 3226 n. 9, 87 L.Ed.2d 267 (1985) (the Court has "never indulged a similar assumption [to *Marsh* ] with respect to prayers conducted at the opening of the school day."); *see also Jager v. Douglas County School Dist.,* 862 F.2d 824 (11th Cir.1989) (recognizing that *Marsh* is inapplicable to school invocations); *Graham v. Central Community School,* 608 F.Supp. 531, 535 (D.Iowa) (same); *but see Stein v. Plainwell Community Schools,* 822 F.2d 1406 (6th Cir.1987) (apparently applying *Marsh* exception in the context of school invocations/benedictions but still finding Establishment Clause violation).

A number of differences between this case and *Marsh* reinforce my view that *Marsh* is inapplicable to school prayer cases. Middle school students are at a very different stage in their development and relationship to prayers than state legislators. The legislators are able to debate and vote on whether and where to have prayers; students have the prayers imposed upon them. Appellants argue that because this is only a once-a-year occurrence it does not implicate the Establishment Clause the way daily prayers do. I disagree. Because graduation represents the culmination of years of schooling and is the school's final word to the students, the prayer is highlighted and takes on special significance at graduation.

The *Stein* decision does not help the appellants. In *Stein,* a Sixth Circuit panel struck down a school invocation and benediction as violating the Establishment Clause. *Stein,* 822 F.2d 1406 (6th Cir. 1987). Each judge wrote an opinion. Judge Merritt, in the court's opinion, thought that the *Marsh* exception applied to school prayer but held that the content of the prayer in question violated the Establishment Clause because it was not sufficiently non-denominational. Judge Milburn concurred in result but added that the *Lemon* test should be applied in examining the invocations and benedictions. Judge Wellford dissented, stating that the *Lemon* test should be applied and that under that test the prayer before the court was acceptable. Such a split in the panel, particularly when the result is contrary to what the appellants seek, is not persuasive authority.

In addition, the analysis of the judges in the majority, in which they parse through the content of the prayers to determine if they are not too offensive, is troubling. The court prohibited the specific prayer because "the language says to some parents and students: we do not recognize your religious beliefs, our beliefs are superior to yours." *Stein,* 822 F.2d at 1410. But the judges imply that some prayers are denominationally neutral enough to offend no one. Such a prayer would be acceptable, under the court's view in *Stein,* under the Establishment Clause. This, I suggest, would be contrary to the teachings of the Court. *See Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 ("[T]he fact that the prayer may be denominationally neutral ... can [not] serve to free it from the limitations of the Establishment Clause"). Such a prayer would also be extremely difficult, if not impossible, to compose. *See Marsh,* 463 U.S. at 819–21, 103 S.Ct. at 3350–51 (Brennan, J., dissenting) (cataloguing the problems with creating a non-denominational prayer).

Judges should not be passing on the acceptability of specific passages in prayers.

*See, e.g., Marsh,* 463 U.S. at 794, 103 S.Ct. at 3337 ("The content of the prayer is not of concern to judges."). The ruling in *Stein* invites parents and students to review prayers to determine if the content is sufficiently neutral. That creates more rather than less religious friction by encouraging individuals to debate the content of prayers.

### 5. THE USE OF A DEITY.

The district court made some statements in the course of its opinion that were in the same vein as the *Stein* court's discussion of non-denominational prayer. Relying on the fact that the invocation and benediction referred to a deity, the court stated that if "God" "had been left out of the benediction ... the Establishment Clause would not be implicated." *Weisman v. Lee,* 728 F.Supp. 68, 74 (D.R.I.1990). This, in my opinion, is too literal and narrow an interpretation of prayer and of what is acceptable under the Constitution. The Constitution prohibits prayer in public schools and not merely references to a deity. An invocation (literally invoking the name of God over the proceedings) and a benediction (blessing the proceedings) are by their very terms prayers and religious. A benediction or invocation offends the First Amendment even if the words of the invocation or benediction are somehow manipulated so that a deity is not mentioned. *See, e.g., Karen B. v. Treen,* 653 F.2d 897, 901 (5th Cir.1981), *aff'd.,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) ("[P]rayer is perhaps the quintessential religious practice for many of the world's faiths ... [it is] an address of entreaty, supplication, praise, or thanksgiving directed toward some sacred or divine spirit, being or object."). Although I think it is probably impossible to pray without invoking a deity directly or indirectly,[14] the direct reference to a deity should not be the constitutional touchstone for our analysis.

In sum, as Justice Black stated long ago, the 'establishment of religion' clause of the First Amendment means at least this:

neither a state nor the federal government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion to another.

*Everson,* 330 U.S. at 15, 67 S.Ct. at 511. By having benedictions and invocations at school graduations, the Providence School District has violated the Establishment Clause. I concur in affirming the opinion of the district court.

CAMPBELL, Circuit Judge (dissenting).

As Judge Torruella states, Chief Judge Boyle's opinion for the district court is indeed "sound and pellucid," in that it expresses well what may be the Supreme Court's ultimate view in this confused area of the law. I say "may." As indicated below, I prefer another view but am aware that the district court's position may be more in keeping with Supreme Court consensus.

I am less amenable to Judge Bownes' reasoning. His seems to me an extreme position, especially his view that a benediction would offend the First Amendment even if a deity were not even mentioned. Judge Bownes would apparently strike down the benediction suggested by the district court (which uses the same words as the challenged prayer, but omits all references to God). That version reads in part, as follows: "For the legacy of America where diversity is celebrated and the rights of minorities are protected we are thankful.... May our aspirations for our country and for these young people, who are our hope for the future, be richly fulfilled." *See Weisman v. Lee,* 728 F.Supp. at 74–75, n. 10. It is difficult to see why this would violate the Establishment Clause. The First Amendment prohibits the making of a law "respecting an establishment of religion, or prohibiting the free exercise thereof." What is there so religious about expressing thanks for diversity and for the protection of minority rights? Is Thanksgiving a forbidden rite? Must courts outlaw the public reading of Walt Whitman or Keats's "Ode on a Grecian Urn"?

---

**14.** Even the "Guidelines for Civic Occasions" recognize that public prayer must "remain faithful to the purposes of acknowledging divine presence and seeking blessing."

These extreme views of my colleague suggest the problems that inhere in banning invocations—including those that mention a deity. By so doing we deprive people of an uplifting message that seems especially suitable for a rite of passage like a graduation, where those present wish to give deeply felt thanks. Our First Amendment jurisprudence normally protects speech rather than suppressing it. It seems anomalous to outlaw Rabbi Gutterman's tolerant, benign, nonsectarian supplication—a message so entirely appropriate in that setting, and surely inoffensive to virtually all of those present.*

If one were to ask people what are the problems of our time, they would hardly respond that our youth and their parents are being corrupted by over-exposure to noble aspirations of this character. The common complaints are that 13 year old children are selling crack; that instead of doing homework, students are watching violent TV; that the tolerant ideals mentioned by the rabbi are being rejected in favor of destructive habits of mind and character. So what good, one might ask, is accomplished by preventing an invocation like this?

The answer, of course, is that we are also concerned to preserve the separation of church and state—a fundamental tenet of our Constitution, the benefits of which are undisputed. One need only look at Lebanon, Iran, and Northern Ireland to see what evils this tenet seeks to avoid.

Yet the question remains, is it necessary—to preserve separation of church and state—to prevent benedictions and invocations of this generous, inclusive sort? There is a tradition of such remarks at public functions going back to the Founders. *See Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (sustaining prayer at opening of state legislature's session). It seems unreasonable to say that *Marsh* applies only to state legislative sessions. One would expect it to cover other public meetings. If so, it may extend to a graduation ceremony like this. *See Stein v. Plainwell Community Schools*, 822 F.2d 1406 (6th Cir.1987) (upholding nonsectarian prayers at a public school graduation). Chief Judge Boyle, nonetheless rejected the *Stein* and the *Marsh* analogy. He not only felt that *Marsh* was strictly limited to a *legislative* session, he also believed that prayer at a graduation ceremony was more analogous to prohibited school prayer than to prayer at a legislative session. He further feared church-state entanglement if courts must determine what prayers are nonsectarian enough to pass muster.

I am troubled most by Chief Judge Boyle's last point. Still, it seems reasonably simple to separate out sectarian from nonsectarian utterances. I suspect that most Americans of all persuasions—including the increasing numbers who adhere to religions or ethical systems outside the Judeo–Christian framework—find it is appro-

---

* Rabbi Gutterman's invocation reads, in its entirety, as follows:

God of the Free, Hope of the Brave:
For the legacy of America where diversity is celebrated and the rights of minorities are protected, we thank You. Happy these young men and women grow up to enrich it.
For the liberty of America, we thank You. May these new graduates grow up to guard it.
For the political process of America in which all its citizens may participate, for its court system where all can seek justice we thank You. May those we honor this morning always turn to it in trust.
For the destiny of America we thank You. May the graduates of Nathan Bishop Middle School so live that they help to share it.
May our aspirations for our country and for these young people, who are our hope for the future, be richly fulfilled. AMEN.

The Rabbi's benediction reads as follows:
O God, we are grateful to You for having endowed us with the capacity for learning which we have celebrated on this joyous commencement.
Happy families give thanks for seeing their children achieve an important milestone. Send Your blessings upon the teachers and administrators who helped prepare them.
The graduates now need strength and guidance for the future. Help them to understand that we are not complete with academic knowledge alone. We must each strive to fulfill what You require of us all: To do justly, to love mercy, to walk humbly.
We give thanks to You, Lord, for keeping us alive, sustaining us and allowing us to reach this special, happy occasion. AMEN.

priate and meaningful for public speakers to invoke the deity not as an expression of a particular sectarian belief but as an expression of transcendent values and of the mystery and idealism so absent from much of modern culture.

I think that *Marsh* and *Stein* provide a reasonable basis for a rule allowing invocations and benedictions on public, ceremonial occasions, provided authorities have a well-defined program for ensuring, on a rotating basis, that persons representative of a wide range of beliefs *and ethical systems* are invited to give the invocation. The rule should make provision not only for representatives of the Judeo–Christian religions to give the invocation, but for representatives of other religions and of nonreligious ethical philosophies to do so. In some years, lay persons who do not represent any organized religion or philosophy might be asked to give a nonreligious invocation. The possibility exists, of course, that a particular audience might occasionally be exposed to a prayer redolent of a particular religious tradition, but the next year a different invocation would be given—perhaps by an agnostic. In brief, I think the First Amendment values are more richly and satisfactorily served by inclusiveness than by barring altogether a practice most people wish to have preserved.

It appears, both from the sensitivity of the delivered prayer and the nonsectarian guidelines drawn up by the Assistant Superintendent, that the Providence School Committee went some distance to ensure that different faiths were included and that prayers were nonsectarian. It may be, however, that even more needs to be done, to ensure not only that the state does not identify itself with a particular religion but with religion generally. If so, I would simply require the Committee to broaden its rules as above suggested, and, otherwise, to continue to permit invocations and benedictions of diverse character at high school and middle school graduations.